**Not for Publication**

| | |
|---|---|
| JACK A. SHULMAN,<br><br>*Plaintiff,*<br><br>v.<br><br>FACEBOOK.COM, ET AL.,<br><br>*Defendant(s).* | Civil Action No. 17-764 (JMV) (LDW)<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

This case arises from Plaintiff's claims that Defendants are engaged in a vast conspiracy to stop Plaintiff's media company from using Facebook. Currently before the Court are Defendants'[1] motions to dismiss *pro se* Plaintiff Jack A. Shulman's Second Amended Complaint ("SAC"), D.E. 91, D.E. 92, and Defendant Facebook's motion to transfer, D.E. 93. The Court previously dismissed Plaintiff's Amended Complaint without prejudice. D.E. 79, 80. The Court has considered the parties' submissions[2] and has considered the motions without oral argument

---

[1] Defendants are Facebook, Inc. ("Facebook"), as well as National Public Radio, Inc. ("NPR"), Cable News Network, Inc. ("CNN"), Public Broadcasting System ("PBS"), and NewsHour Productions LLC ("NewsHour Productions") (collectively, excluding Facebook, the "Media Defendants").

[2] Defendants CNN, NPR, PBS, and NewsHour Production's brief in support of their motion to dismiss will be referred to as "Media Defs. Br." (D.E. 91); Defendant Facebook's brief in support of its motion to dismiss will be referred to as "Def. Facebook. Br." (D.E. 92); Plaintiff brief in opposition will be referred as "Pl. Opp." (D.E. 106); the Media Defendants' reply brief will be referred as "Media Def. Reply" (D.E. 108); Defendant Facebook's reply brief will be referred to as "Facebook Reply" (D.E. 109).

Defendant Facebook's brief in support of its motion to transfer will be referred to hereinafter as "Facebook Transfer Br." (D.E. 93); Plaintiff's brief in opposition to Facebook's

pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. Defendants' motions to dismiss (D.E. 91, D.E. 92) are **GRANTED** and Defendant Facebook's motion to transfer (D.E. 93) is **DENIED** as moot.

## I. FACTUAL BACKGROUND[3]

Plaintiff states he brings his claims as "Jack A. Shulman d/b/a Advances Magazine, and individually." SAC at ¶ 1.[4] Plaintiff's allegations are, in general, rambling and difficult to follow. The Court also notes that Plaintiff's claims have changed from the First Amended Complaint ("FAC"). The FAC alleged that Defendants violated the First, Fourth, Fifth, and Fourteenth Amendments, the Americans with Disabilities Act, New Jersey's Law Against Discrimination, and engaged in a RICO conspiracy by censoring his political speech on Facebook. *See* First Amended Complaint ("FAC"), D.E. 13.

In a general sense, Plaintiff's SAC now alleges that the Defendants participated in a conspiracy scheme to prevent Plaintiff's business, Advances Magazine, from competing with the Media Defendants on Facebook. *See id.* at ¶ 24. Plaintiff has been using Facebook since 2009, *id.* at ¶ 56, and "started investing in and engaging in intensified business use of Facebook.com in 2015 . . . seeking to enter into and compete in the electronic News Media and Publishing market,

---

motion to transfer will be referred to hereinafter as "Pl. Transfer Opp." (D.E. 107); Defendant Facebook's reply will be referred to hereinafter as "Facebook Transfer Reply" (D.E. 110).

[3] The facts are derived from Plaintiff's SAC, D.E. 82. The specific factual allegations in the SAC are disjointed and unclear. However, when reviewing a motion to dismiss, the Court accepts as true all well-pleaded facts in a complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

[4] Later, Plaintiff states that he brings the case on behalf of himself and "entities Advances Magazine and CREGI.com." SAC at ¶ 8; *see id.* at ¶ 54 ("Plaintiff's Advances Magazine is an electronic News Media and Publishing company who also operates an internet service provider known as CREDGI.com . . . and a number of related business activities."). Plaintiff never explains the relevance of CREGI.com to his allegations.

2

*id.* at ¶ 57. Plaintiff claims that Facebook (and apparently the Media Defendants) suspended Plaintiff's ability to post on Facebook based on false allegations that Plaintiff was "spamming and . . . breaching community standards." *Id.* at ¶ 26. Plaintiff claims that he was suspended from Facebook twenty-two times within the last year, "depriv[ing] the plaintiff of 222 out of 365 calendar days of business . . . and caused him to lose over $150,000 in investments in his business." *Id.* at ¶ 27. Plaintiff details his "top fifteen [] suspensions," including when he "post[ed] a copy of Pamela Gellar's defense of Israel from George Soros," "post[ed] a news item about Uranium One and Mrs. Clinton from the NY Times," "post[ed] a link to a White House Briefing," and when he "disagree[d] with TV Minister Joel Osteen's claim that all activities by Muslims the world over were driven by their 'discovery' of God's Love, and must not be questioned . . . [and Plaintiff responding] that God's Love did not include the death of 69 million 'infidels' nor the comments of Islamic Religious leader Adbullah Juber." *Id.* at ¶ 27. Plaintiff claims that these "22 suspensions were baseless and entirely without merit and cost plaintiff his full investment in his business for over 4 years." *Id.* at ¶ 31.

Plaintiff then turns to allegations related to Facebook's advertising system. In sum, Plaintiff "believes [D]efendant Facebook has set up a business model that shakes down the small business person, using software that operates automatically and accompanied by corporate policies designed to hide it." *Id.* at ¶ 49. Plaintiff alleges "an anticompetitive scheme wherein [Plaintiff's] pay-ins for advertising were producing little or no impact and priced far, far higher per 'click thru' than defendants CNN, PBS and NPR, often overloading [Plaintiff] with inexplicable 'ad views' that had no effect whatsoever since [D]efendant Facebook's users gave them no mind." *Id.* at ¶ 32. Plaintiff claims that Facebook's advertising system could only benefit entities that were "'National Brand[s]' whose name, logo and reputation might serve as 'click bait'—a way to draw

the user's attention away from reading whatever [n]ews or comments they were engrossed in." *Id.* at ¶ 32. Plaintiff explains that Facebook's advertising system is "'price fixing' against the benefit of the small competitor and thus reduces competition, by its very nature, due to the lack of 'confirmed attraction' to the alleged 'impression' and 'viewing window' and likelihood of false positives." *Id.* at ¶ 37. Plaintiff contends that "Large Brand Name companies with recognized Logos have no equivalent problem." *Id.* In essence, Plaintiff claims that this "violates anticompetition laws by its one sided design to benefit only 'big brands.'" *Id.* at ¶ 39.

Plaintiff alleges that the Defendants "behave as a RICO Enterprise" because "Plaintiff believes [D]efendant Facebook and those who've joined it through a PAY TO PLAY agreement and buy ins such as defendants, CNN, PBS and NPR, reap mutual rewards by doing harm to smaller competitors." *Id.* at ¶ 50. Plaintiff adds that this "RICO Enterprise"

> engages in 'baiting', 'false reporting of illegal conduct', 'violation of the public trust', and other wrongdoing so as to draw off cash on hand from the smaller competitor, plaintiff, who through a deceptive 'lure the rubes' draws smaller competitors into deceptive and fraudulent business practices produce [sic] little or no results but benefit the larger defendants CNN, PBS and NPR, and repeatedly, anti-competitively suspending the plaintiff's business on Facebook.com and even acted to disrupt momentum, and to prevent [Plaintiff] from drawing a large following, by canceling his News posted to large affinity groups on Facebook.com, who would otherwise be very interested in reading [Plaintiff's] NEWS, causing him to lose roughly 222 days of the past 365 days to suspension, unable to promote, unable to advertise, unable to post News, build followers and ultimately, losing all formerly developed business momentum and his investment in it of substantial money, time and effort.

*Id.* at ¶ 50. More specifically, Plaintiff claims that Facebook "promised Plaintiff vast public exposure, low rates for advertising and engages in [sic] mutual protection with them of their media concentration in the market, helping him to increase [Plaintiff's] competitive position in the electronic News Media and Publishing market." *Id.* at ¶ 60. Instead, Plaintiff claims that his

4

business "was treated deceptively and was injured by [Facebook's] anti-competitive schemes that benefit the larger businesses including CNN, PBS and NPR, at the expense of smaller competitor [sic] like the plaintiff." *Id.* at ¶ 61. For example, Plaintiff states that he learned that "Defendants CNN, PBS and NPR are given rates as low as $0.16 per advertisement clicked through by a user, and are given 100% distribution of their news to the viewers on [Facebook] through the Newsfeed(s)," while this option was not offered to Plaintiff. *Id.* at ¶ 62.

In sum, Plaintiff claims that Defendant Facebook engaged in much of this conduct "as part of a horizontal integration of its own media activities with competitor [D]efendants CNN, PBS and NPR, in support of their patronage, without regard for the consequences upon [P]laintiff, in fact intended to victimize [P]laintiff and other businesses like [P]laintiff[']s, for their own self enrichment." *Id.* at ¶ 155. Plaintiff continues that

> the [D]efendants knew that [Facebook] could provide a means to continuously expand their monopolistic control over the market for electronic New publishing, and, [D]efendant Facebook who[] in combination with [D]efendants CNN, PBS and NPR, lures the unwary (plaintiff, others) in, steals their money delivering nothing to smaller competitors but a steadily declining ability to compete, ads that are worthless, abuses and suppresses them, violates their privacy and premises, humiliates their vulnerabilities and keeps expanding to gain control of more and more of the Internet, while suppressing smaller competition, to the favor of its pay-to-play partners in the Enterprise, [D]efendants CNN, PBS and NPR.

*Id.* at ¶ 169.

## II. PROCEDURAL HISTORY

On February 2, 2017, Plaintiff filed his initial Complaint. D.E. 1. On March 13, 2017, Plaintiff filed the FAC. D.E. 13. On November 6, 2017, the Court dismissed the FAC without prejudice. D.E. 79, 80. The Court also denied Plaintiff's motion for partial summary judgment and motion for Rule 11 sanctions. D.E. 79, 80.

5

On November 29, 2017, Plaintiff filed the SAC. D.E. 82. On January 11, 2018, Facebook filed a motion to dismiss. D.E. 91. On the same day, the Media Defendants filed a motion to dismiss. D.E. 92. Plaintiff filed opposition to both motions, D.E. 106, to which Facebook and the Media Defendants replied, D.E. 108, 109. Defendant Facebook also filed a motion to transfer this case to the United States District Court for the Northern District of California, D.E. 93, to which Plaintiff filed opposition, D.E. 107, and to which Facebook replied, D.E. 110.

### III. STANDARD OF REVIEW

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a count for "failure to state a claim upon which relief can be granted[.]" To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Id.* at 789.

In evaluating the sufficiency of a complaint, a district court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007). If,

6

after viewing the allegations in the complaint most favorable to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim. *DeFazio v. Leading Edge Recovery Sols.*, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010).

Because Plaintiff is proceeding *pro se*, the Court construes the pleadings liberally and holds him to a less stringent standard than those filed by attorneys. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). However, the "Court need not . . . credit a *pro se* plaintiff's 'bald assertions' or 'legal conclusions.'" *D'Agostino v. CECOM RDEC*, 2010 WL 3719623, at *1 (D.N.J. Sept. 10, 2010).

## IV. ANALYSIS

Plaintiff's SAC brings five counts.[5] Count One alleges violations of the "Clayton Act," SAC at ¶¶ 174-189; Count Two alleges violations of the "CAN-SPAM Act (coordinated with CDA violations)" and include what Plaintiff calls "Count Two(B): CDA/CAN-SPAM violations in the context of psychological gaslighting," *id.* at ¶¶ 213-227; Count Three alleges a RICO conspiracy, *id.* at ¶¶ 228-248; Count Four alleges violations of various New Jersey laws, *id.* at ¶¶ 249-252; and Count Five alleges a "privacy violation and use of keylogger/mouse logging 'spyware' software by Defendant Facebook," *id.* at ¶¶ 253-270.[6]

---

[5] The Court attempts to organize Plaintiff's counts in a cohesive manner, although the counts frequently repeat allegations and do not follow a comprehensible structure.

[6] Because the Court finds that Counts One, Two, Three, and Four fail to plausibly plead any claims for relief, the Court does not address Defendants' alternative arguments for dismissal of these counts, including that (1) Plaintiff lacks standing to sue for harms allegedly suffered by Advances Magazine and CREGI.com, and that (2) Plaintiff fails to satisfy the pleading requirements of Rule 9(b).

### A. Count One (Antitrust Claims)

Plaintiff stylizes Count One as an action for "Clayton Act Violations," but Plaintiff appears to bring claims under the Sherman Act, 15 U.S.C. §§ 1 *et seq.*, the Clayton Act, 15 U.S.C. §§ 12 *et seq.*, the Robinson-Patman Act, 15 U.S.C. §§ 13 *et seq.*, the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, and the New Jersey Antitrust Act, N.J.S.A. 56:9, *et seq.* As a general matter, Count One alleges that Defendant Facebook's apparent "pay per view" advertisement pricing model burdens smaller media competitors to the benefit of larger companies like Defendants CNN, PBS, and NPR. *See* SAC at ¶¶ 178-189. Plaintiff claims that this advertising model amounts to an "anticompetitive scheme" and "price fixing." *Id.* at ¶ 179. Plaintiff asserts that the anticompetitive scheme also includes Facebook's suspensions of Plaintiff's account, as well as harassment Plaintiff experienced on Facebook. *Id.* at ¶ 182.

#### i. Sherman Act

Count One mentions the Sherman Act in passing. *Id.* at ¶ 179. Presumably, Plaintiff alleges a Sherman Act violation as to his allegations concerning Defendants' "price fixing" and "anticompetitive" conduct. Defendants argue Plaintiff's Sherman Act claims (to the extent that he brings any) should be dismissed, in part, because Plaintiff fails to identify any relevant market that Defendants attempt to monopolize.

"To establish a civil cause of action under Section One [of the Sherman Act], a plaintiff must prove four elements: (1) that the defendants contracted, combined, or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy." *Only v. Ascent Media Grp., LLC*, No. 06-2123, 2006 WL 2865492, at *5 (D.N.J.

8

Oct. 5, 2006); *see Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005). Under Section Two of the Sherman Act, a plaintiff must allege the following to state a claim for monopolization: "'(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident.'" *Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*, 159 F.3d 129, 141 (3d Cir. 1998) (quoting *Schuylkill Energy Resources v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 412-13 (3d Cir. 1997) *cert. denied*, 522 U.S. 977 (1997)). A plaintiff must show the following for attempted monopolization: "'(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *Crossroads Congeneration Corp.*, 159 F.3d at 141 (quoting *Schuylkill*, 113 F.3d at 413).

Here, the Court finds that Plaintiff fails to plausibly state a claim under either Section One or Two of the Sherman Act. First, Plaintiff does not plausibly allege any monopoly. Indeed, Plaintiff claims that Defendants have a market share of 9.8%. SAC at ¶ 188. This is not enough market share to constitute a monopoly. *See Only*, 2006 WL 2865492, at *5 ("Courts generally do not find that a defendant company has monopoly power if it controls less than 50 percent of the given market."). Second, Plaintiff fails to plausibly identify any relevant market that Defendants are monopolizing. Plaintiff only makes general allegations that Defendants are attempting to monopolize the "electronic News Media and Publishing market." *See* SAC at ¶¶ 24, 34, 57, 60. In order to successfully plead a violation of the Sherman Act, Plaintiff "must show the possession of monopoly power in the relevant market." *Dockins v. Ridge*, No. 96-0975, 1998 WL 848119, at *3 (E.D. Pa. Dec. 2, 1998). Plaintiff's broad and undefined references to the electronic news media and publishing market does not suffice to plausibly state a claim. *See, e.g., Queen City Pizza, Inc.*

*v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) ("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted."). Therefore, any claim Plaintiff attempts to bring under the Sherman Act is dismissed.

### ii. Clayton Act and Robinson-Patman Act

Count One also repeatedly mentions the Clayton Act and Robinson-Patman Act. SAC at ¶¶ 179, 182, 186. Plaintiff claims that Defendants engaged in "pricing discrimination" and a "discriminatory price fixing relationship of horizontal integration." *Id.* at ¶¶ 187-188.

"The Robinson-Patman Act, [15 U.S.C. § 13(a),] which amended the Clayton Act, [15 U.S.C. §§ 12-27,] prohibits price discrimination 'where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly.'" *Crossroads Cogeneration Corp.*, 159 F.3d at 142 (quoting 15 U.S.C. § 13(a)). "In order to state a claim under the Robinson-Patman Act, a plaintiff must allege facts to demonstrate that (1) the defendant made at least two contemporary sales of the same commodity at different prices to different purchasers; and (2) the effect of such discrimination was to injure competition." *Crossroads Cogeneration Corp.*, 159 F.3d at 142.

Plaintiff fails to plausibly state a claim under the Robinson-Patman Act because Plaintiff fails to allege any "commodity" as covered by the Act. Plaintiff's allegations relate to advertising space on Facebook. However, advertising is not a "commodity" under the Robinson-Patman Act. *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1195 (3d Cir. 1995) (stating that "the [Robinson-Patman] Act applies only to commodities *and not services like advertising*" (emphasis

10

added)). Accordingly, the Court finds that the SAC fails to plausibly state a claim under Section Two of the Clayton Act.[7] Therefore, Plaintiff's Clayton Act and Robinson-Patman Act claims are dismissed.[8]

### iii. Lanham Act

Count One also repeatedly mentions the Lanham Act, including Sections 1125(a)(1)(A) and 1125(a)(1)(B). *See* SAC at ¶¶ 20, 26, 47. Plaintiff alleges that Defendants made "false and misleading statement[s] . . . that caused plaintiff harm," SAC at ¶ 20, including

> false statements accusing plaintiff of SPAMMING or violating Community Standards, and intentional delivery of anti-Semitic and other hate speech and harassment by trolls, likely due to its demoralizing character and tendency to evoke a response from which might come further suspensions, is also a Lanham Act statement likely to or actually hurtful to plaintiff's business.

---

[7] Defendant Facebook also contends that Plaintiff fails to allege that Plaintiff and other competitors were charged different prices for the same "pay per view" service. Facebook Br. at 14-15. The Court, however, declines to rule based on this argument because it is unclear from Plaintiff's confusing allegations whether Plaintiff was charged the same or different prices for advertising. *Compare* SAC at ¶¶ 42 ("Estimates came to about 1/1000 the number of visitors to plaintiff versus visitors to CNN *at the identical price*." (emphasis added)); ¶ 182 (claiming that Facebook's pricing scheme "could produce no benefit to plaintiff *at the same prices* as defendants CNN, PBS and NPR" (emphasis added)); *with* ¶ 32 (alleging that in the advertising scheme, Plaintiff's "pay-ins for advertising were producing little or no impact and *priced far, far higher per 'click thru'* than defendants CNN, PBS and NPR" (emphasis added)). It appears that Plaintiff is alleging that while CNN, PBS, and NPR were charged the *same price* for advertising space, Plaintiff thinks he received *fewer benefits* from his purchase because his advertising did not reach as many Facebook users. Because Plaintiff's allegations are unclear, and because the Court dismisses Plaintiff's claims on other grounds, the Court declines to analyze this issue further.

[8] It appears that Plaintiff's Clayton Act and Robinson-Patman Act claims are limited to allegations of price-fixing. However, as Defendant Facebook identified, Facebook Br. at 16, Plaintiff also repeatedly mentions Defendants' alleged "horizontal integration." *See* SAC at ¶¶ 18, 72, 155, 164, 179, 188. Plaintiff fails to clarify what he means by "horizontal integration." To the extent that Plaintiff claims that "horizontal integration" violates Section Seven of the Clayton Act, Plaintiff does not state a valid claim. Section Seven bars mergers that in effect, "may . . . substantially . . . lessen competition, or tend to create a monopoly." 15 U.S.C. § 18; *see Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3d Cir. 2016). Plaintiff fails to identify any relevant merger.

*Id.* at ¶ 47; *see id.* at ¶ 26.

The Lanham Act, 15 U.S.C. § 1051, *et seq.*, generally provides a system for trademark registration and for the protection of registered marks. The Court finds that Plaintiff fails to plausibly state a claim under the Lanham Act. Section 1125(a)(1)(A) refers to infringement of unregistered trademarks – and Plaintiff's allegations never mention a trademark. To state a viable claim under Section 1125(a)(1)(B) based on a false or misleading representation, a plaintiff must allege:

> 1) that the defendant has made false or misleading statements as to his own product or another's;
> 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience;
> 3) that the deception is material in that it is likely to influence purchasing decisions;
> 4) that the advertised goods traveled in interstate commerce; and
> 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

*Warner-Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 91–92 (3d Cir. 2000) (brackets omitted) (citing *Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v. Rhone-Poulenc Rorer Pharmaceuticals, Inc.*, 19 F.3d 125, 129 (3d Cir. 1994)). Plaintiff does not identify any false or misleading statements that Defendants made regarding Defendant or Plaintiff's product. As a result, to the extent that Plaintiff brings claims based on the Lanham Act, these claims are dismissed.

### iv. New Jersey Antitrust Act

Plaintiff briefly alleges a violation of "anti-competition anti Trust law [sic] (section 56:9 of the New Jersey Code) alleging Contractual Restraint of Trade. . . ." SAC at ¶ 251. The Court assumes that Plaintiff intends to bring an action pursuant to the New Jersey Antitrust Act, N.J.S.A. 56:9, *et seq.* However, Plaintiff provides no additional factual allegations or analysis of this claim

and does not identify which part of the statute he is invoking. Nevertheless, any New Jersey Antitrust Act claim would fail for the same reasons that his federal antitrust claims failed. *See Only*, 2006 WL 2865492, at *8 (finding that further amendment of a plaintiff's pleadings would be futile because the plaintiff's federal antitrust claims failed to state a claim, and because "the New Jersey Antitrust Act shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes" (quotation omitted)).

Plaintiff fails to plausibly state any viable claims under the Sherman Act, Clayton Act, Robinson-Patman Act, Lanham Act, or New Jersey Antitrust Act. For this reason, Count One is dismissed.

### B. Count Two (Communications Decency Act and CAN-SPAM Act)

Count Two brings claims under the Communications Decency Act ("CDA"), 47 U.S.C. § 230, and the CAN-SPAM Act, 15 U.S.C. §§ 7701(a), 7704(a). Plaintiff claims that Defendants (presumably Facebook) censored Plaintiff's posts fifteen times through January 2017 to November 2017 as "spam" without cause. SAC at ¶ 204. Plaintiff asserts that the censorship was "on a discriminatory basis as part of an anticompetitive scheme to discourage plaintiff from developing a competitive Media Publication, and thus impeding the competitive company, plaintiff's Advances Magazine's ability to enter and compete in the market for Electronic News Media and Publishing." *Id.* at ¶ 197. As described below, the Court finds that Plaintiff fails to plausibly state a claim under either the CDA or the CAN-SPAM Act.[9]

---

[9] The Court's analysis of Count Two includes Plaintiff's allegations in Count Two and "Count Two(B)." SAC at ¶¶ 213-227.

13

### i. Communications Decency Act

Plaintiff attempts to bring claims under Section 230 of the CDA. However, as a general proposition, Section 230 of the CDA immunizes website publishers from claims arising from the exercise of publishing decisions and editorial judgment. Section 230 provides, in part, that

> No provider or user of an interactive computer service shall be held liable on account of—
> (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
> (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

47 U.S.C.A. § 230(c). "Importantly, Section 230(c)(2)(A) does not require the user or provider of an interactive computer service to demonstrate that the otherwise "objectionable" material is actually objectionable." *Smith v. Trusted Universal Standards in Elec. Transactions, Inc.*, No. 09-4567, 2011 WL 900096, at *5 (D.N.J. Mar. 15, 2011) (citations omitted). "Users or providers of an interactive computer service may determine that spam is material that is harassing or otherwise objectionable under Section 230(c)(2)(A)." *Id.* (citation omitted).

The CDA further provides, in part, that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider," 47 U.S.C. § 230(c)(1), and that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section," *id.* at § 230(e)(3). "Together, these sections provide immunity to an interactive computer service provider as a publisher or speaker of information originating from another information

content provider." *Obado v. Magedson*, 612 F. App'x 90, 93 (3d Cir. 2015) (quotation and brackets omitted). As the Third Circuit has observed, "decisions relating to monitoring, screening, and deletion of content from [a] network" are "actions quintessentially related to a publisher's role." *Green v. Am. Online (AOL)*, 318 F.3d 465, 471 (3d Cir. 2003). "Section 230 specifically proscribes liability in such circumstances." *Id.* (citation omitted).

In sum, Section 230 "precludes courts from entertaining claims that would place a computer service provider in a publisher's role, and therefore bars lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone, or alter content." *Green*, 318 F.3d 471 (quotations omitted); *see Marfione v. KAI U.S.A., Ltd.*, No. 17-70, 2018 WL 1519042, at *6 (W.D. Pa. Mar. 28, 2018). Therefore, instead of providing Plaintiff with a cause of action, Section 230 instead shields Defendant Facebook from civil liability. Plaintiff's claim based on Section 230 of the CDA is dismissed.

### ii. CAN-SPAM Act

Plaintiff also brings similar claims under the CAN-SPAM Act in Count Two and "Count Two(B): CDA/CAN-SPAM VIOLATIONS IN THE CONTEXT OF PSYCHOLOGICAL GASLIGHTING." In part, Plaintiff claims that Defendants (again, presumably Facebook) censored Plaintiff's speech and labeled him as a "spammer." The Court finds that Plaintiff fails to plausibly state a claim under the Act.

The CAN-SPAM Act, 15 U.S.C. §§ 7702, *et seq.*, does not provide Plaintiff a vehicle to bring his claims. The Act generally governs commercial electronic mail (e-mail) messages. *See* 15 U.S.C. § 7701 (describing the Congressional findings and purpose of the Act). "To state a claim under the CAN-SPAM Act . . . a plaintiff must show that the defendant: (1) transmitted

15

commercial electronic mail messages; (2) to a protected computer; and (3) that those messages included header information or subject headings that were materially misleading." *DistributorsOutlet.com, LLC, v. Glasstree, Inc., et al.*, No. 11-6079, 2016 WL 1273229, at *3 n.4 (E.D.N.Y. Mar. 31, 2016) (citing *Yahoo! Inc. v. XYZ Companies*, 872 F. Supp. 2d 300, 304 (S.D.N.Y. 2011)). Plaintiff fails to include any allegations regarding any e-mail messages he received from Defendants. Accordingly, Plaintiff's claims brought under the CAN-SPAM Act are dismissed.

### C. Count Three (RICO Claims)

Count Three ostensibly brings claims under the federal civil RICO statute, 18 USC §§ 1961-1965, as well as the New Jersey civil RICO statute, 2C:41-2(c). Specifically, Plaintiff claims that Defendants were in a "RICO Enterprise" that "engaged in an anticompetitive ('pay to play') scheme to discourage plaintiff from developing a competitive Media Publication, thus impeding the competitive company, plaintiff's Advances Magazine's ability to enter and compete in the market for Electronic News Media and Publishing." SAC at ¶ 230.

To bring a federal civil RICO claim in accordance with 18 U.S.C. § 1962, a plaintiff must allege: "(1) the conducting of, (2) an enterprise, (3) through a pattern, (4) of racketeering activity." *Gunter v. Ridgewood Energy Corp.*, 32 F. Supp. 2d 166, 173 (D.N.J. 1998). To establish a "pattern of racketeering," a plaintiff must allege "at least two predicate acts of racketeering that occurred within ten years of each other." *Slimm v. Bank of Am. Corp.*, 2013 WL 1867035, at *20 (D.N.J. May 2, 2013). "New Jersey's civil RICO statute is substantially similar" to the federal civil RICO statute. *Sharp v. Kean Univ.*, 153 F. Supp. 3d 669, 674 (D.N.J. 2015). A plaintiff must allege the following to state a New Jersey RICO action:

> (1) the existence of an enterprise; (2) that the enterprise engaged in activities that affected trade or commerce; (3) that the defendant was

employed by or associated with the enterprise; (4) that the defendant participated in the conduct of the affairs of the enterprise; (5) that the defendant participated through a pattern of racketeering activity; and (6) that the plaintiff was injured as a result of the conspiracy.

*Galicki v. New Jersey*, No. 14-169, 2015 WL 3970297, at *7 (D.N.J. June 29, 2015) (quotation omitted).

Plaintiff fails to plausibly state a claim under either the federal or New Jersey civil RICO statutes. Plaintiff states that the relevant predicate acts for his RICO claims are selling Plaintiff advertising "that turned out to be valueless advertising inventory," "continuing and meritless, baseless suspensions of plaintiff's [Facebook account] intended to blockade his ability to proceed after his attaining nearly a [sic] 1 million user following," and "[o]ngoing harassment and abuse of plaintiff by threats, hate speech literature, abusive remarks, [and] reputation denigration." SAC at ¶ 147. None of these acts are sufficiently pled to be considered a predicate act under the relevant RICO statutes. *See* 18 U.S.C. § 1961(1) (listing specific acts that constitute federal RICO predicate acts); 2C:41-1 (listing specific acts that constitute New Jersey RICO predicate acts).

Plaintiff provides additional conclusory allegations, such as that Defendants engaged in "wire fraud and a pattern of unlawful racketeering behavior . . . which took place in interstate commerce across interstate wires," along with myriad other allegations. SAC at ¶ 18. But these statements are simply conclusory allegations without factual support. The Court will not accept such bald assertions. *See D'Agostino*, 2010 WL 3719623, at *1.

Plaintiff fails to plausibly state any viable claims under the federal or New Jersey civil RICO statutes. Count Three is dismissed.[10]

---

[10] Defendant Facebook alternatively argues that Count Three should be dismissed because Plaintiff lacks standing to bring his RICO claims. Facebook Br. at 24-27. The Court has concerns that even if Plaintiff pled a plausible claim, he would not have standing. But the Court does not reach the issue.

17

### D. Count Four (New Jersey State Law Claims)

Count Four brings claims under a variety of New Jersey laws, including, the "New Jersey General Business Law" and the "Personal Information and Privacy Protection Act." SAC at ¶ 251.[11]

Plaintiff's claims based on the "General Business Law" are dismissed because Plaintiff fails to identify any statute by which these claims are brought. The Court assumes Plaintiff means to refer to New Jersey's Personal Information and Privacy Protection Act ("PIPPA"), N.J.S.A. 56:11-5, *et seq. See* SAC at ¶ 251. However, PIPPA has no applicability to Plaintiff's claims. PIPPA provides privacy protections for consumers when a retail establishment scans the consumer's driver's license. *See* N.J.S.A. 56:11-55 (describing the only circumstances when a "retail establishment [may] scan a person's identification card" legally). When referring to PIPPA, Plaintiff also mentions three federal statutes that he seems to assume are somehow incorporated into PIPPA: the Fair Credit Reporting Act, the Gramm-Leach-Bliley Act, and the Fair Debt Collections Act. SAC at ¶ 251. Neither PIPPA, nor these federal acts, are applicable to Plaintiff's claims.

Accordingly, Plaintiff fails to plausibly state any claim for relief., and Count Four is dismissed.[12]

---

[11] Plaintiff also, again, repeatedly discusses the New Jersey civil RICO statute in Count Four. However, the Court has already addressed and dismissed these claims in its analysis of Count Three.

[12] The SAC, in a much earlier section, briefly refers to "the New Jersey Consumer Protection and Consumer Fraud Act NJ 56:8 ('NJ CPCFA')." SAC at ¶ 19. The New Jersey Consumer Fraud Act ("CFA") requires a plaintiff to demonstrate "(1) an unlawful practice, (2) an 'ascertainable loss,' and (3) a causal relationship between the unlawful conduct and the ascertainable loss." *Lee v. Carter-Reed Co.*, 203 N.J. 496, 521 (2010) (internal quotations and citations omitted). Plaintiff fails to address any of the required elements for a CFA claim. Thus, if the SAC is asserting a CFA claim, it is dismissed.

### E. Count Five

Plaintiff stylizes his last claim as "COUNT FIVE: PRIVACY VIOLATION and USE OF KEYLOGGER/MOUSE LOGGING 'SPYWARE' SOFTWARE BY DEFENDANT FACEBOOK." *See* SAC at ¶¶ 253-70. Plaintiff cites the "Computer Act, the Computer Fraud Act, and the privacy acts cited in the Venue and Jurisdiction chapter above." *Id.* at ¶ 269. Plaintiff fails to cite any specific statute. The Court will not engage in a fishing expedition by attempting to guess what federal statutes Plaintiff means to reference. *See Bishop v. Dep't of Homeland Sec.*, No. 14-5244, 2015 WL 2125782, at *4 (D.N.J. May 6, 2015) (stating that "while *pro se* pleadings are liberally construed, '*pro se* litigants still must allege sufficient facts in their complaints to support a claim.'" (quoting *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013), *aff'd sub nom.*, 648 F. App'x 180 (3d Cir. 2016))).

Accordingly, because Count Five fails to state any federal causes of action, it is dismissed.

### V. CONCLUSION

In sum, Defendants' motions to dismiss (D.E. 91, D.E. 92) are **GRANTED**. Facebook's motion to transfer (D.E. 93) is **DENIED** as moot. When dismissing a case brought by a *pro se* plaintiff, a court must decide whether the dismissal will be with prejudice or without prejudice. Dismissing without prejudice affords a plaintiff with leave to amend. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 110-11 (3d Cir. 2002). The district court may deny leave to amend only if (a) the moving party's delay in seeking amendment is undue, motivated by bad faith, or prejudicial to the non-moving party or (b) the amendment would be futile. *Adams v. Gould, Inc.*, 739 F.2d 858, 864 (3d Cir. 1984). Plaintiff has already been given a chance to amend his pleadings to clarify his claims. Moreover, when dismissing the FAC, the Court made clear the deficiencies in each of Plaintiff's claims, and the SAC makes no real effort to address these shortcomings. In fact,

Plaintiff's SAC brings an entirely new set of allegations. As a result, the Court finds that any additional amendment would be futile. Accordingly, Plaintiff's SAC is dismissed with prejudice, which means that Plaintiff will not be able to bring any future action against Defendants based on the allegations in this case. An appropriate Order accompanies this Opinion.

**Date:** July 9, 2018

　　　　　　　　　　　　　　　　　　　　　　　　＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
　　　　　　　　　　　　　　　　　　　　　　　　John Michael Vazquez, U.S.D.J.